## IN RE ESTATE OF PETER PAKARINEN.
## DOROTHY JEANNETTE HIETALA v.
## THE HEIR OF PETER PAKARINEN.*

178 N. W. (2d) 714.

June 19, 1970—No. 41833.

---

* Record certified to United States Supreme Court September 15, 1970.

*Maslon, Kaplan, Edelman, Borman, Brand & McNulty, Richard A. Shors, Fred R. Jacobberger, Greenberg & Greenberg,* and *M. H. Greenberg,* for appellant.

*Jack J. Litman* and *Edward W. Peterson,* for respondent.

Heard before Knutson, C. J., and Rogosheske, Sheran, Frank T. Gallagher, and Theodore B. Knudson, JJ.

ROGOSHESKE, JUSTICE.

Appeal from an order of the district court dismissing an appeal from the probate court.

The sole issue presented is whether Minn. St. 525.172, which prescribes the standard of proof necessary for an illegitimate child to inherit from his putative father who dies intestate, makes an unreasonable classification between legitimate children and illegitimate children in violation of the equal-protection clause of the Fourteenth Amendment to the United States Constitution and of Minn. Const. art. 1, § 2, and art. 4, §§ 33 and 34. We hold that it does not.

Peter Pakarinen, appellant's putative father, died intestate on August 10, 1966, leaving no spouse or legitimate children surviving him. Appellant, Dorothy Jeannette Halfors Hietala, was born March 17, 1937, to Lorraine Johnson, nee Halfors. Her birth certificate named the decedent, Peter Pakarinen, as the father. On October 23, 1937, the decedent, upon his plea of guilty in a paternity proceeding, was adjudged by the district court to be the father of the female child born to Lorraine Halfors on March 17, 1937. As additional proof of parentage in these proceedings, appellant offered a letter decedent had written her which contained the salutation "My Dear Daughter" and was signed "Daddy," the testimony of appellant's mother, Lorraine Johnson, that decedent was appellant's father, and appellant's testimony

that decedent had admitted this fact to her. Based on this undisputed and unchallenged evidence, appellant claimed that she was the illegitimate daughter of decedent and that, as such, under one of the statutory provisions governing intestate succession,[1] she, as decedent's sole surviving child, is entitled to inherit his entire estate. Based upon appellant's admission, the district court found that decedent did not formally acknowledge appellant to be his child as required by § 525.172, affirmed the probate court's order decreeing decedent's estate to his sister as his sole heir at law, and dismissed appellant's appeal.

Section 525.172 provides:

"An illegitimate child shall inherit from his mother the same as if born in lawful wedlock, *and also from the person who in writing and before a competent attesting witness shall have declared himself to be his father,* provided such writing or an authenticated copy thereof shall be produced in the proceeding in which it is asserted; but such child shall not inherit from the kindred of either parent by right of representation." (Italics supplied.)

It has long been established that § 525.172 absolutely precludes inheritance by an illegitimate child from a putative father in all cases where the father dies intestate without making the attested written declaration of paternity required by the statute,[2] and that an adjudication of paternity designed to fix liability for support of the child does not confer any right of inheritance and is not the equivalent of the required statutory proof.[3] It is clear, therefore, that if the standard of proof required by § 525.172 is constitutionally permissible, appellant is not entitled to inherit decedent's estate.

Conceding that the prevention of fraudulent claims against

---

[1] Minn. St. 525.16 (4) (a).

[2] In re Estate of Snethun, 180 Minn. 202, 230 N. W. 483; Reilly v. Shapiro, 196 Minn. 376, 265 N. W. 284.

[3] In re Estate of Karger, 253 Minn. 542, 93 N. W. (2d) 137.

an estate is a legitimate purpose and that the state may constitutionally require an illegitimate to prove that he is in fact the child of the father from whom he seeks to inherit, appellant argues that the standard of proof chosen by the state violates her constitutional right to equal protection of the law because, in contrast to the proof of paternity required of a legitimate child, it denies her any independent means of proof, however worthy, and makes her right to inherit wholly dependent upon the acts or omissions of her father, thus arbitrarily and irrationally discriminating between legitimate and illegitimate children.

Appellant's constitutional challenge raising a question of first impression is provoked by, and essentially based upon, two recent decisions of the United States Supreme Court, Levy v. Louisiana, 391 U. S. 68, 88 S. Ct. 1509, 20 L. ed. (2d) 436, and Glona v. American Guarantee & Lia. Ins. Co. 391 U. S. 73, 88 S. Ct. 1515, 20 L. ed. (2d) 441. In the Levy case, the Supreme Court held that it was an unconstitutional violation of equal protection to deny illegitimate children the right to recover damages for the wrongful death of their mother, upon whom they were dependent. Contemporaneously, in Glona the court held that it was a denial of equal protection of the laws to withhold relief to the mother for the wrongful death of her child merely because the child was born out of wedlock. The court, indicating that the underlying rationale of these decisions is that the classification between legitimate and illegitimate children bears no reasonable relation to the purpose of a state statute authorizing recovery for death by wrongful act, said in the Levy case (391 U. S. 71, 88 S. Ct. 1511, 20 L. ed. [2d] 439) :

"* * * When the child's claim of damage for loss of his mother is in issue, why, in terms of 'equal protection,' should the tortfeasors go free merely because the child is illegitimate? Why should the illegitimate child be denied rights merely because of his birth out of wedlock?"

The court also said (391 U. S. 71, 88 S. Ct. 1511, 20 L. ed. [2d] 439):

"While a State has broad power when it comes to making classifications * * *, it may not draw a line which constitutes an invidious discrimination against a particular class. * * * Though the test has been variously stated, the end result is whether the line drawn is a rational one. * * *

* * * * *

"Legitimacy or illegitimacy of birth has no relation to the nature of the wrong allegedly inflicted on the mother. * * *

"We conclude that it is invidious to disciminate against [illegitimate children] when no action, conduct, or demeanor of theirs is possibly relevant to the harm that was done the mother."

It must be acknowledged that these decisions establish that discrimination based solely upon illegitimacy is no longer constitutionally permissible. This result may well have been foreshadowed by the numerous instances where commentators and courts, including this one, have decried the legislative failure to enact statutes mitigating the harshness of the common-law rule which regarded a child born out of wedlock as "the child of nobody" or "the child of the people" in his social and economic relationships and "barbarically handicapped and burdened children of illegitimate parents for sins in the commission of which they had no part." In re Estate of Karger, 253 Minn. 542, 548, 93 N. W. (2d) 137, 142; Jung v. St. Paul Fire Dept. Relief Assn. 223 Minn. 402, 27 N. W. (2d) 151. As expected, the rationale of the United States Supreme Court decisions has already become the subject of considerable comment and has been successfully applied to strike down invidious discrimination against illegitimates in situations other than those relating to recovery for death by wrongful act. For example, in R—— v. R—— (Mo.) 431 S. W. (2d) 152, and Storm v. None, 57 Misc. (2d) 342, 291 N. Y. S. (2d) 515, it was held that illegitimate children have equal rights with legitimate children to support from their

fathers, and that to withhold support from a child, either by statute as in the Missouri case or by a parental agreement as in the New York case, simply because he was born out of wedlock is an unconstitutional denial of "equal protection."[4] While we unhesitatingly agree that such distinctions made solely on the basis of legitimacy are a denial of equal protection, neither Levy, Glona, nor these decisions can be considered controlling authority for the proposition that it is constitutionally impermissible to require an illegitimate attempting to inherit from his putative father to produce virtually unassailable proof that the decedent is in fact his father for the distinct purpose of determining his rights of inheritance. The underlying purpose of laws relating to inheritance is quite different from the purpose intended to be served by laws creating a cause of action for death by wrongful act or laws determining liability for child support. Child-support laws have little concern with the wishes and desires of parents, and the primary objective of a wrongful-death statute is to compensate those suffering pecuniary loss by reason of their dependency on the person whose death resulted from the wrongful act of another. As the United States Supreme Court has declared, any distinction between legitimates and illegitimates bears no relation to the purposes of such laws.

North Dakota appears to be the only jurisdiction that has applied the Levy rationale to declare unconstitutional a provision of its intestate-succession statute which prohibits an illegitimate child from inheriting through either parent unless his parents have intermarried. In re Estate of Jensen (N. D.) 162

---

[4] See, also, Armijo v. Wesselius, 73 Wash. (2d) 716, 440 P. (2d) 471; Hebert v. Petroleum Pipe Inspectors, Inc. (5 Cir.) 396 F. (2d) 237; In re Estate of Oritz, 60 Misc. (2d) 756, 303 N. Y. S. (2d) 806; Schmoll v. Creecy, 54 N. J. 194, 254 A. (2d) 525. But see, Murphy v. Huoma Well Service (5 Cir.) 413 F. (2d) 509; Strahan v. Strahan (W. D. La.) 304 F. Supp. 40. See, generally, Krause, *Legitimate and Illegitimate Offspring of Levy v. Louisiana—First Decisions on Equal Protection and Paternity*, 36 U. of Chicago L. Rev. 338.

N. W. (2d) 861.[5] However, the provision of the North Dakota statute, which in the Jensen case precluded an illegitimate child from inheriting from a legitimate child of their common mother, absolutely prevented an illegitimate from inheriting, no matter how unassailable his proof of maternity.

While a similar restriction in our statutes relating to the inheritance of illegitimates by right of representation might, in a proper case, be subject to the same constitutional infirmities found by the North Dakota court, that problem is not before us. The narrow issue here presented is whether classifying illegitimates by limiting the right to inherit from a putative father to only those who can meet the statutory standard of proof of paternity is a rational classification; that is, whether it bears any intelligible relation to the purpose of our descent statutes, which are essentially designed to give effect to the presumed desires of a decedent who dies intestate.

Generally, a person is free to leave his property to whomever he wishes upon his death by making a will. See, 57 Am. Jur., Wills, § 50. The laws of descent are a legislative attempt to provide for the orderly distribution of property left by an intestate decedent.

"* * * It has been said that the passing of property upon intestacy is pursuant to a statutory will, which * * * is considered to be such a distribution as the intestate presumably would have made had he made a will. The general policy is to follow the lead of the natural affections and to consider as most worthy the claims of those who stand nearest to the affections of the intestate." 23 Am. Jur. (2d) Descent and Distribution, § 10.

We must therefore assume that the legislature, in adopting § 525.172, sought to achieve a scheme of intestate distribution of property which would incorporate the presumed desires and intentions that a decedent who died intestate would have had if he had given thought to the disposition of his property after his

[5] But see, Strahan v. Strahan, *supra*.

death. Keeping this in mind, it cannot be said that distinctions made in § 525.172 are "irrational" or bear no "relation to the purpose" sought to be achieved.

The legislature, in making such a "statutory will," must make generalized assumptions concerning the preferences of one dying intestate. It is apparent that the legislature determined that illegitimate children usually stand as close to the affection and concern of their mothers as do legitimate children. This determination is incorporated in § 525.172, which permits illegitimate children to inherit from their mothers the same as legitimate children. This provision negates a legislative intention to invidiously discriminate solely on the basis of legitimacy.

Since the section, however, does impose limitations on illegitimates inheriting from a claimed father, the question arises as to the justification for the different treatment afforded this classification of illegitimates. Even a superficial inquiry requires recognition that there are significant differences between an illegitimate child's relationship to his mother and the person he claims to be his father. First and most obvious is the difference with which the certainty of the blood relationship can be determined. While the identity of the mother of an illegitimate child is usually, if not always, easy to establish, even the mother is not always sure who the father is. Where a putative father denies paternity, no method of proof we are now aware of exists by which fatherhood can be conclusively established. Nothing—not a blood test, nor a judgment of paternity after trial, nor a voluntary plea of guilty to a charge of paternity in open court—proves with absolute certainty the paternity of the father. And while a written attested declaration of paternity does not provide absolute proof, it does offer the most persuasive proof available (short of marriage to the mother) of the pivotal element: An unequivocal acknowledgment of paternal affection and concern for the illegitimate child. Unlike a plea of guilty, which may be made to avoid the expense and embarrassment of trial in a paternity suit, a voluntary written statement which manifests

the man's desire to accept this child as his own is such an acknowledgement and, from the public view, establishes both a biological and legal relationship to him. Where such a relationship exists, it is likely that the child will be accepted by the father, treated as his child, and thus be a natural object of his bounty and included in, or indeed required to be intentionally omitted from, any testamentary disposition by the father.[6] Surely, when viewed with respect to the objectives of the laws of intestacy, it cannot be said that the legislature arbitrarily chose a more exacting standard of proof to establish paternity than the standard which governs the resolution of ordinary fact issues. We recognize that the undeniable effect of § 525.172 is to place a greater burden on an illegitimate than is placed on a legitimate, and that this is done notwithstanding the fact that the innocent child cannot with any justification be held accountable for the transgressions of his parents.

Even though some better way might be devised to further mitigate the inhuman effect of the common-law rule, we are compelled to hold that the challenged provision of § 525.172 is constitutional, for it cannot be said that the line it draws between the right of legitimates and illegitimates seeking to inherit from a father is irrational or bears no intelligible proper relationship to the purposes sought to be achieved by this and other sections of our Probate Code governing the descent of property upon death.

Affirmed.

---

[6] § 525.201.